IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
WESTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Case No. 20-00191-01-CR-W-BP |
| ) | |
| TERRQUAN J. BEASLEY, ) | |
| ) | |
| Defendant. ) | |

REPORT AND RECOMMENDATION

This matter is currently before the Court on defendant Terrquan J. Beasley's Motion to Suppress (Doc. #16). For the reasons set forth below, it is recommended that this motion be denied.

I. BACKGROUND

On August 26, 2020, the Grand Jury returned a one-count Indictment against defendant Terrquan J. Beasley. The Indictment charges that on May 12, 2020, defendant Beasley, knowing he had previously been convicted of a crime punishable by imprisonment for a term exceeding one year, knowingly possessed a firearm, to wit, a Ruger, semi-automatic pistol, model P89DC, 9 mm x 19 caliber, serial number 303-50342, which firearm had been transported in interstate commerce.

An evidentiary hearing on the motion to suppress was held on March 10, 2021. Defendant Beasley was represented by Assistant Federal Public Defender W. Marc Ermine. The Government was represented by Assistant United States Attorney Sean T. Foley. The Government called Detective LaSonia Whaley, Officer Mitchell Powell, III, Officer Francisco Duque, Officer Jacob Giangrosso, and Detective David Adair of the Kansas City, Missouri Police Department as witnesses. The defense called no witnesses to testify.

## II. FINDINGS OF FACT

On the basis of the evidence presented at the evidentiary hearing, the undersigned submits the following proposed findings of fact:

1. On May 12, 2020, Officer LaSonia Epperson[1] was riding with Officer Mitchell Powell, a probationary officer. (Tr. at 4-5.) Officer Epperson was performing the duty of field training officer for Officer Powell. (Tr. at 5.) Field training officers observe and evaluate probationary officers after they graduate from the police academy while they are in their field training phase. (Tr. at 6, 99.) A probationary officer will ride with a field training officer for ten weeks. (Tr. at 6, 100.) During the field training phase, probationary officers respond to calls for service. (Tr. at 6-7.) Field training officers make sure that probationary officers are safe and that they apply the standardized training they received at the police academy. (Tr. at 6.) Officer Powell started his field training on May 11, 2020. (Tr. at 8.) On May 11, the probationary officers were given tours of the Kansas City area. (Tr. at 73.) May 12 was the first day that the probationary officers took calls for service. (Tr. at 74.)

2. A call went out on May 12, 2020, that there was a shooting at Research Medical Center. (Tr. at 21.) At 1:47 p.m., Officer Epperson told dispatch to clear them from their previous call and to hold them out to Research Medical Center. (Tr. at 21.) Over the radio, Officer Epperson heard that the shooting victim was in the ER at Research Medical Center and that the shooting had occurred somewhere near 80th Street and Brooklyn. (Tr. at 23, 45.) It was reported that the passenger of the vehicle had to move the driver to the back seat in order to bring him to Research Medical Center and that on the way to the hospital, they hit another vehicle. (Tr. at 23.) Dispatch came back on the radio at 1:47:50 p.m. and said that a call had just been received about a shooting near 8-1 and Brooklyn. (Tr. at 23; Gov. Exh. 2.) Several police officers were dispatched to that area. (Tr. at 23; Gov. Exh. 2.) Officer Epperson testified that the shooting was a fluid and developing situation. (Tr. at 24.)

3. Officer Epperson testified that shooting incidents are high priority calls. (Tr. at 8.) Officer Epperson explained that when officers arrive on a shooting incident call, the first thing they should do is make sure the scene is safe, that is make sure there is no threat or continued threat. (Tr. at 8-9.) Next, they locate the victim to see if life-saving efforts are needed. (Tr. at 9.) After that, the officers can slow down and look at the evidence. (Tr. at 9.) Officer Epperson testified that shooting incidents involve a threat of firearms possession. (Tr. at 9.) When responding to shooting incidents, officers must be cognizant of the possibility that there might be

---

[1] Officer Epperson (now Whaley) has since been promoted to detective. (Tr. at 5.) The Court will refer to Detective Whaley as Officer Epperson throughout this Report and Recommendation.

weapons in the car, weapons on a person, or weapons that were thrown in the bushes. (Tr. at 9, 32.)

4. This was the first time that Officer Powell had responded to a shooting incident call. (Tr. at 8, 76.) Officer Powell testified that he was nervous. (Tr. at 76.) When Officers Epperson and Powell arrived at Research Medical Center, Officer Frank Duque (a field training officer) and Officer Jacob Giangrosso (a probationary officer) were already there. (Tr. at 9-10, 77.) Officer Duque was supervising Officer Giangrosso. (Tr. at 101.) Like Officer Powell, this was Officer Giangrosso's second day of field training and his first shooting incident call. (Tr. at 101, 120-21.) Officer Giangrosso testified that he was anxious, but also excited. (Tr. at 121.)

5. Officers Duque and Giangrosso arrived at Research Medical Center at approximately 1:48 p.m. and Officers Epperson and Powell arrived approximately one minute later. (Tr. at 11-12; Gov. Exh. 1 and 2.[2]) Officers Duque and Giangrosso were talking with two black males (later identified as Terrquan Beasley and Jamil Jackson) when Officers Epperson and Powell arrived. (Tr. at 12, 26, 77, 102, 121-22.) Officer Giangrosso testified that he was asking Beasley and Jackson what had happened and where it happened. (Tr. at 122.) Officer Giangrosso testified that Jackson told him that they were just sitting in the vehicle when someone started shooting at them. (Tr. at 123.) Jackson stated that a Mr. Brown originally had been driving, but he was shot and Jackson had to take over the driving. (Tr. at 123.) Beasley did not offer much information, stating that when he heard the shots, he ducked down. (Tr. at 29, 124.) Officers Duque and Giangrosso testified that Beasley and Jackson were cooperative. (Tr. at 111-12, 129.) At 1:49:12 p.m., dispatch put out another call. (Tr. at 25; Gov. Exh. 2.) This call reported that two black males had been shooting on the block or up the block near 80th and Brooklyn. (Tr. at 26; Gov. Exh. 2.) After walking up to the group, Officer Epperson returned to her vehicle to get gloves after seeing blood on the front of one of the individual's clothing. (Tr. at 13.)

6. The SUV which was parked in the ambulance bay at Research Medical Center had a shattered rear window. (Tr. at 14, 102, 121.) There were what appeared to be bullet holes on the back of the SUV and through the front windshield. (Tr. at 14-15, 18.) It appeared that the SUV had struck another vehicle or an object as indicated by the dent in the front bumper of the vehicle. (Tr. at 15.) There was blood inside the vehicle and on the concrete outside the vehicle. (Tr. at 15, 17-19, 121.) Government's Exhibits 3 through 23 are photographs of the SUV as it was parked at Research Medical Center.

7. Officer Epperson returned to the group after getting her gloves at 1:50:29. (Tr. at

---

[2]Government's Exhibits 1 and 2 are dashcam videos from the officers' vehicles which recorded the scene at Research Medical Center. (Tr. at 10.)

3

28; Gov. Exh. 1 and 2.) Officer Epperson testified that Mr. Jackson was reporting that he was not quite sure where they were located when the shooting occurred, but he remembered seeing an 81st Street sign. (Tr. at 28-29.) Officer Epperson testified that the information that Jackson was providing was consistent with the information that Officer Epperson knew from dispatch. (Tr. at 50.) Officer Epperson testified that at this point, the officers were investigating various crimes, that is a shooting (which started off as an aggravated assault and might turn into a homicide) as well as a claim for property damage or an accident report (for hitting the other vehicle). (Tr. at 29-30.)

8. At 1:50:30 p.m., Officer Duque told Officer Giangrosso to have Mr. Beasley and Mr. Jackson sit on some benches that were located away from the vehicle, because the vehicle is considered a crime scene. (Tr. at 105, 124; Gov. Exh. 1 and 2.)

9. At 1:51:19 p.m., Officer Epperson asked Officer Powell if the two subjects had been patted down. (Tr. at 31, 79; Gov. Exh. 2.) Officer Epperson asked this question because typically subjects are patted down early on during a shooting call. (Tr. at 32.) Officer Epperson testified that the caller had advised that there were two black males shooting up the block and that the officers were speaking with two black males at Research Medical Center who were somehow involved in the shooting. (Tr. at 33.) Officer Epperson was concerned for the safety of the officers. (Tr. at 32.) Officer Epperson was concerned that there could be a firearm in the vehicle or on a subject's person. (Tr. at 33.) Officer Epperson testified that while Mr. Jackson had told the officers that they were victims and/or witnesses of the shooting, the officers did not know whether that was true. (Tr. at 33-34.) Both Officers Epperson and Duque testified that they have encountered victims of crimes who have been armed. (Tr. at 34, 105.) Officer Epperson explained the safety concerns as follows:

> Well, for me, I want to make sure people aren't armed because, like I said, I don't know if they're a suspect or a victim. I don't know if they are, you know, could shoot me or another officer. So, for me as a priority to make sure that they're away from the vehicle and make sure that there aren't any firearms on their person when I'm investigating a shooting.

(Tr. at 34.) Officer Duque testified that he always frisks for weapons on a shooting call. (Tr. at 107.)

10. Officer Giangrosso was the primary officer on the call and Officer Powell was the secondary officer. (Tr. at 35, 77, 103.) The primary officer is normally responsible for the scene. (Tr. at 35.) The secondary officer is there to assist the primary officer. (Tr. at 35, 77.) Officer Epperson testified that as a police officer, she wants to make sure the scene is safe. (Tr. at 35.) At 1:51:29 p.m., Officer

4

Powell asked Officer Giangrosso whether the subjects had been patted down and Giangrosso said that he had not completed a pat-down. (Tr. at 35, 79; Gov. Exh. 1 and 2.) Officer Giangrosso testified that he had not frisked the subjects immediately upon arriving at the scene because he was technically by himself, so it would not have been a safe practice. (Tr. at 122.) Officer Giangrosso testified that Officer Duque was with him for "just overseeing and suggesting and training purposes." (Tr. at 122.) Officer Giangrosso testified that Officer Epperson's suggestion that the subjects be frisked was a "necessary step, due to the nature of the call" and that it was "good for officer safety and the safety of those around us." (Tr. at 127.)

11. Officer Epperson testified that if she had been the primary officer controlling the scene, she would have moved the two subjects away from the vehicle for safety reasons sooner than was done on this call. (Tr. at 52.) Officer Epperson testified that she also would have frisked the two subjects sooner than was done here. (Tr. at 52-53.) Officer Duque testified that he probably would have frisked the two subjects immediately, but he was waiting to see how long it would take for the probationary officers to do it. (Tr. at 107.) Field training officers are to give their probationary officers some time to process what is going on and to display the training they received at the academy. (Tr. at 53.) Officer Epperson testified that if a field training officer feels that a probationary officer is doing something incorrectly or not fast enough, the field training officer should step in. (Tr. at 53.)

12. At 1:51:32 p.m., after Officer Epperson found out that Mr. Beasley and Mr. Jackson had not been patted down, she stepped in and asked them whether they had any weapons on them. (Tr. at 36, 80, 125; Gov. Exh. 1 and 2.) Officer Epperson testified that she was trained to always ask prior to frisking a subject if the subject has any weapons on them or if the subject has anything that might poke, cut, or injure her while conducting the frisk. (Tr. at 39-40.) Officer Duque testified that he asks a subject if they are armed before he frisks them. (Tr. at 108.) Officer Giangrosso testified that he had been trained at the academy to ask a subject if they are armed before doing a frisk for safety reasons. (Tr. at 125.) If the subject says that they do have a weapon, Officer Epperson testified that she asks them where it is located. (Tr. at 39.) The purpose of the question is officer safety, not evidence gathering. (Tr. at 40.) Jackson said that he did not have a weapon. (Tr. at 36, 126.) Beasley initially said that he did not have a weapon. (Tr. at 126.)

13. Officer Epperson testified that only one subject should be frisked at a time due to safety issues. (Tr. at 37.) Officer Epperson testified that Officers Giangrosso and Powell decided between themselves that Officer Powell would frisk Mr. Beasley first and then Officer Giangrosso would frisk Mr. Jackson. (Tr. at 37.) At 1:51:42 p.m., Officer Powell asked Beasley to stand up to be patted down.[3] (Tr. at

---

[3]While Officer Powell wrote in his report that prior to frisking Mr. Beasley, he asked Beasley whether Beasley had any weapons on him, Officer Powell could not recall asking Beasley this

5

37, 80; Gov. Exh. 2.) Officer Epperson testified that she told Beasley and Jackson that they were not under arrest, but that they were being detained pending further investigation because the officers did not have all the facts. (Tr. at 50.) Officer Epperson testified that other officers were going to different scenes to gather evidence and information. (Tr. at 51.) When Beasley stood up, he advised that he had a gun on him and that it was under his arm. (Tr. at 37, 56, 80-81, 126.) Beasley had not been advised of his *Miranda* rights. (Tr. at 92.) The gun was in Beasley's armpit, under his hoodie. (Tr. at 38, 81.) Beasley was placed in handcuffs and Officer Powell recovered the gun from Beasley's person. (Tr. at 93.) Officer Powell cleared the weapon. (Tr. at 56, 94.) At 1:53 p.m., Officer Powell and Officer Duque put the gun in a police vehicle to secure it until there was further direction from the Assault Squad detectives. (Tr. at 56-58, 94; Gov. Exh. 1 and 2.) Officer Giangrosso obtained identifying information from Jackson and Beasley beginning at 1:54:40 p.m. (Gov. Exh. 1.)

14. Officers Epperson and Duque each testified that even if no weapon had been found on Mr. Beasley, he and Mr. Jackson would have had to remain at the scene to speak with Assault Squad detectives who would be investigating the shooting. (Tr. at 41, 109.) Detective David Adair, a detective with the Assault Squad, also testified that Beasley and Jackson would have had to remain at the scene even if no weapon had been recovered. (Tr. at 147.) Officer Epperson testified that it had not yet been determined if Beasley and Jackson were suspects or victims. (Tr. at 41.) Officer Duque testified that he did not know if Beasley and Jackson were victims or suspects, he just assumed that they were involved in some way. (Tr. at 104.)

15. Detective Adair arrived at Research Medical Center at 2:20:15 p.m. (Tr. at 137; Gov. Exh. 2.) Detective Adair testified that he had previous experience in responding to hospitals on reports that gunshot victims had been dropped off. (Tr. at 137.) In his experience, sometimes people dropping off gunshot victims are involved in the shooting. (Tr. at 137.) Further, in his experience, sometimes people dropping off gunshot victims are armed. (Tr. at 137.) Finally, in his experience, sometimes people dropping off gunshot victims have nothing to do with the shooting. (Tr. at 138.)

16. Detective Adair relayed identifying information over the telephone for the two subjects who were detained, Mr. Beasley and Mr. Jackson, back to his squad. (Tr. at 138.) Detective Adair wanted to determine whether Beasley was a felon, given that he was found with a firearm. (Tr. at 139.) At 2:23:37 p.m., Detective Adair told Officer Epperson that there was a full U.S. extradition warrant for one of the subjects. (Tr. at 41-42, 59, 139; Gov. Exh. 2.) An Order for Capias Warrant for Terrquan J. Beasley was issued by a Jackson County Circuit Court on August 15,

---

question. (Tr. at 91-92.) However, Officer Powell testified that he had been trained at the academy to ask individuals he was about to frisk whether they have any weapons on them. (Tr. at 95.)

2019. (Tr. at 141; Gov. Exh. 26.) Beasley was taken from the scene by police at approximately 2:43 p.m. (Gov. Exh. 2.)

17. Detective Adair testified that Mr. Beasley would have been run for wants and warrants, even if a firearm had not been found on him. (Tr. at 144, 146.) Detective Adair testified that it is routine practice to run crime victims for warrants when conducting an investigation into a shooting. (Tr. at 146.) Upon discovering that Beasley had a warrant for his arrest, he would have been arrested on that warrant and frisked pursuant to that arrest. (Tr. at 144.) At that time, the firearm would have been discovered. (Tr. at 144.)

### III. DISCUSSION

Defendant Beasley seeks to suppress all evidence, and the testimony related to such evidence, seized from his person on May 12, 2020. Defendant Beasley's motion to suppress is based on the following argument:

> The search and seizure of Mr. Beasley and his belongings violated his rights under the Fourth Amendment to the United States Constitution because the police detained Mr. Beasley and searched his person and his belongings without a warrant, probable cause, reasonable suspicion, or valid consent. The police also violated Mr. Beasley's Fifth Amendment rights by interrogating him without advising him of his *Miranda* rights.

(Doc. #16 at 1.)

The Supreme Court has described three categories of police-citizen encounters. *See Florida v. Royer*, 460 U.S. 491 (1983). *See also United States v. Hernandez*, 854 F.2d 295, 297 (8th Cir. 1988). "The first, and least intrusive, police contact occurs when law enforcement officers merely approach an individual on the street and ask if he is willing to answer some questions. Because this encounter in a public place is consensual, it does not constitute a seizure within the meaning of the fourth amendment." *Hernandez*, 854 F.2d at 297 (citing *Royer*, 460 U.S. at 497). The second is a brief, minimally intrusive seizure or investigative stop which must be supported by a reasonable suspicion of criminal activity. *See Royer*, 460 U.S. at 498-99;

7

*Hernandez*, 854 F.2d at 297. The third is a full-scale seizure arrest which must be supported by probable cause to arrest. *See Royer*, 460 U.S. at 499; *Hernandez*, 854 F.2d at 297.

In order to determine whether a particular encounter is consensual or constitutes a seizure, a court must consider all the circumstances surrounding the encounter to determine whether the police conduct would have communicated to a reasonable person that the person was not free to decline the officers' requests or otherwise terminate the encounter. *See Florida v. Bostick*, 501 U.S. 429, 439 (1991); *United States v. Robinson*, 984 F.2d 911, 913 (8th Cir. 1993). Only when an officer, by means of physical force or show of authority, has in some way restrained the liberty of an individual should a court conclude that a seizure has occurred. *See Bostick*, 501 U.S. at 434; *Robinson*, 984 F.2d at 913-14.

In the present case, both defendant Beasley and the government appear to agree that the initial encounter between the officers and the defendant was consensual. Defendant Beasley contends that the encounter escalated to a detention when he was directed by the officers to sit on the bench. (Motion to Suppress at 5; Doc. #16.) The government contends that the encounter was consensual until Beasley was told he would be frisked. (Government's Response at 6; Doc. #21.) In determining whether an officer had reasonable suspicion to conduct an investigative stop, the court must look at the totality of the circumstances to see whether the detaining officer had a particularized and objective basis for suspecting criminal activity. *See United States v. Montgomery*, 828 F.3d 741, 743-44 (8th Cir. 2016).

At the time that defendant Beasley was directed to sit on the bench (as well as when Beasley was told he would be frisked), the officers were confronted with the following circumstances. The officers had been dispatched to Research Medical Center on a shooting call.

8

(Fact No. 2.) The initial information provided over the radio was that the shooting victim was in the ER at Research Medical Center, that the shooting had occurred somewhere near 80th Street and Brooklyn, that the passenger of the vehicle had to move the driver to the back seat in order to bring him to the hospital, and that on the way to the hospital, they hit another vehicle. (*Id.*) Additional information was provided by dispatch that a call had come in about a shooting near 8-1 and Brooklyn. (*Id.*) The shooting was a fluid and developing situation as officers were going to different scenes to gather evidence and information. (Fact Nos. 2 and 13.) After Officers Duque and Giangrosso and Officers Epperson and Powell arrived at Research Medical Center and were in contact with defendant Beasley and Jamil Jackson, dispatch relayed that another caller had reported that two black males had been the shooters in the area of 80th and Brooklyn. (Fact No. 5.) Officer Epperson testified that the officers were speaking with two black males at Research Medical Center who were somehow involved in the shooting. (Fact No. 9.) Officer Epperson testified that while Jackson had told the officers that they were victims and/or witnesses of the shooting, the officers did not know whether that was true. (*Id.*) Officer Duque testified that he did not know if Beasley and Jackson were victims or suspects, he just assumed that they were involved in some way. (Fact No. 14.) The Court finds that the officers had a reasonable, articulable suspicion of criminal activity and, thus, were justified in conducting an investigative stop of defendant Beasley and Mr. Jackson.

However, even if the officers did not have a reasonable suspicion that defendant Beasley and Mr. Jackson were involved with criminal wrongdoing, the officers could nevertheless detain Beasley and Jackson to obtain information from them as potential witnesses to a crime so long as the Fourth Amendment's reasonableness requirement was satisfied. *See Illinois v. Lidster*, 540

Case 4:20-cr-00191-BP   Document 34   Filed 05/10/21   Page 9 of 14

U.S. 419, 426-27 (2004); *Walker v. City of Orem*, 451 F.3d 1139, 1148 (10th Cir. 2006); *United States v. Patrick*, No. 4:17-CR-034-01-HLM-WEJ, 2018 WL 5722667, at *3 (Nov. 1, 2018). "In judging reasonableness, courts apply a balancing test that looks to 'the gravity of the public concerns served by the seizure, the degree to which the seizure advances the public interest, and the severity of the interference with individual liberty.' *Brown v. Texas*, 443 U.S. 47, 51 (1979)." *Walker*, 451 F.3d at 1148. Applying these three *Brown* factors, the Court finds the conduct of the officers here reasonable. First, the public concern was grave given that the officers were investigating a shooting crime. Second, the officers had reason to believe that defendant Beasley had specific information about the shooting in question, thus his seizure advanced the public interest in finding out information relating to the shooting. Third, the detention interfered only minimally with defendant Beasley's liberty as Beasley was detained: (1) for only two minutes before a firearm was found on his person (Beasley was directed to sit on a bench at 1:50:30 p.m. and Officer Powell requested that Beasley stand up to be frisked at 1:51:42 p.m.); (2) for approximately thirty minutes before the detective who would be investigating the shooting arrived on the scene (from 1:50:30 p.m. to 2:20:15 p.m. when Detective Adair arrived); and (3) for approximately three additional minutes before it was determined that Beasley had a felony conviction and that there was an outstanding warrant for his arrest (Detective Adair advised Officer Powell of the warrant at 2:23:37 p.m.). The length of defendant Beasley's detention before there was suspicion and then probable cause for his arrest does not appear to be unreasonable. *See Williams v. Decker*, 767 F.3d 734, 741-42 (8th Cir. 2014) (stating there is no rigid time limit on an investigatory detention and finding that taking roughly thirty minutes to pursue an investigation that includes securing a weapon and

10

ascertaining the subjects' criminal histories did not run afoul of the Fourth Amendment).

With respect to the officers' authority to frisk defendant Beasley, the Court notes that "a police officer may take steps reasonably necessary to protect his or her personal safety and the safety of others and to maintain the status quo of a situation while verifying or dispelling suspicion in a short period of time." *United States v. Seelye*, 815 F.2d 48, 50 (8th Cir. 1987) (citing *United States v. Jones*, 759 F.2d 633, 636-37 (8th Cir.), *cert. denied*, 474 U.S. 837 (1985)). A police officer may conduct a pat-down search of the suspect during an investigative stop if the officer has reason to believe that such person might be armed and dangerous. *See Terry v. Ohio*, 392 U.S. 1, 30 (1968). To determine whether officers had reasonable suspicion to frisk an individual, courts must examine the totality of the circumstances, including inferences and deductions based on the officers' own experiences and training. *See United States v. Davison*, No. 13-00433-01-CR-W-BP, 2014 WL 2957055, *2 (W.D. Mo. July 1, 2014), *aff'd*, 808 F.3d 325 (8th Cir. 2015). Protective measures also allow for the use of handcuffs. *See United States v. Morgan*, 729 F.3d 1086, 1091 (8th Cir. 2013) ("[p]olice officers reasonably may handcuff a suspect during the course of a *Terry* stop to protect their personal safety"); *United States v. Walker*, 555 F.3d 716, 721 (8th Cir. 2009); *United States v. Martinez*, 462 F.3d 903, 907 (8th Cir. 2006), *cert. denied*, 549 U.S. 1272 (2007).

Officer Epperson testified that when responding to shooting incidents, officers must be cognizant of the possibility that weapons might be present. (Fact No. 3.) As set out above, dispatch relayed that a caller had reported that two black males had been the shooters in the area of 80th and Brooklyn. (Fact No. 5.) Officer Epperson testified that the officers were speaking with two black males at Research Medical Center who were somehow involved in the shooting.

(Fact No. 9.) Officer Epperson testified that she was concerned for the safety of the officers in that there could be a firearm in the vehicle or on a subject's person. (*Id.*) Officer Epperson testified that while Mr. Jackson had told the officers that they were victims and/or witnesses of the shooting, the officers did not know whether that was true. (*Id.*) Officer Duque testified that he did not know if defendant Beasley and Mr. Jackson were victims or suspects, he just assumed that they were involved in some way. (Fact No. 14.) Both Officers Epperson and Duque testified that they have encountered victims of crimes who have been armed. (Fact No. 9.) Officer Duque testified that he always frisks for weapons on a shooting call. (*Id.*)

The delay in frisking defendant Beasley and Mr. Jackson (which frisk took place approximately four minutes after the initial officers arrived at Research Medical Center) appears to be related to the inexperience of Officer Giangrosso who was acting as the primary officer. Officer Epperson testified that typically subjects are patted down early on during a shooting call. (Fact No. 9.) Officer Giangrosso testified that Officer Epperson's suggestion that the subjects be frisked was a "necessary step, due to the nature of the call" and that it was "good for officer safety and the safety of those around us." (Fact No. 10.) Officer Epperson testified that if she had been the primary officer controlling the scene, she would have moved the two subjects away from the vehicle for safety reasons sooner than was done on this call and that she would have frisked the two subjects sooner than was done here. (Fact No. 11.) Officer Duque testified that he probably would have frisked the two subjects immediately, but he was waiting to see how long it would take for the probationary officers to do it. (*Id.*)

Given the officers' reasonable suspicion that defendant Beasley and Mr. Jackson were somehow involved in a shooting and that it had not yet been determined whether these two

12

subjects were victims or suspects, the Court finds that the officers had a credible concern for officer safety and the safety of those around them. A frisk for weapons was, therefore, appropriate. The Court also finds that the question posed to Beasley and Jackson as to whether they had any weapons on them was proper.[4] *See United States v. Brooks*, 982 F.3d 1177, 1180 (8th Cir. 2020) (officers not required to give *Miranda* warnings prior to asking subject if he had a weapon where question is prompted by concerns as to officer safety and public safety); *United States v. Becerra*, 958 F.3d 725, 730 (8th Cir. 2020) (same). The purpose of the question was for officer safety, not evidence gathering, and each of the officers had been trained to ask the question before performing a frisk. (Fact Nos. 12 and 13.) No constitutional violation took place.

Finally, even if the officers' actions in questioning defendant Beasley as to whether he was armed and then frisking him were in violation of the Fourth Amendment, which the Court does not believe to be the case, the inevitable discovery exception applies. *See United States v. McManaman*, 673 F.3d 841, 846 (8th Cir. 2012) ("inevitable discovery exception applies when the government proves by a preponderance of the evidence: (1) that there was a reasonable probability that the evidence would have been discovered by lawful means in the absence of police misconduct, and (2) that the government was actively pursuing a substantial, alternative line of investigation at the time of the constitutional violation"). The Court finds that the officers were actively pursuing an alternative line of investigation of the shooting at the time Officer Powell discovered the firearm. The shooting was a fluid and developing situation as officers were going to different scenes to gather evidence and information. (Fact Nos. 2 and 13.) While

---

[4]While defendant Beasley argues that he should have received *Miranda* warnings before officers questioned him about the shooting if the officers suspected Beasley had committed the shooting (Defendant's Reply at 4; Doc. #22), the only statement that Beasley appears to seek to suppress is his statement that he had a weapon.

Officer Giangrosso, as the primary officer, asked Beasley and Jackson questions about what had happened and where it happened (Fact No. 5), Beasley and Jackson were being detained at the scene so that they could speak with Assault Squad detectives who would be investigating the shooting more thoroughly (Fact No. 14). Detective Adair testified that he would have run Beasley for wants and warrants, even if a firearm had not been found on him, as it is routine practice to run crime victims for warrants when conducting an investigation into a shooting. (Fact No. 17.) Upon discovering that Beasley had a warrant for his arrest, Beasley would have been arrested on that warrant and frisked pursuant to that arrest. (*Id.*) At that time, the firearm would have been discovered. (*Id.*) Thus, the Court finds that even if Officer Powell had not seized the firearm, officers would have "inevitably discovered" the firearm during a frisk incident to arrest.

## IV. CONCLUSION

Based on the foregoing, it is

RECOMMENDED that the Court, after making an independent review of the record and applicable law, enter an order denying defendant Beasley's Motion to Suppress (Doc. #16).

Counsel are reminded they have fourteen days from the date of receipt of a copy of this Report and Recommendation within which to file and serve objections. A failure to file and serve timely objections shall bar an attack on appeal of the factual findings in this Report and Recommendation which are accepted or adopted by the district judge, except on the grounds of plain error or manifest injustice.

*/s/ Lajuana M. Counts*
Lajuana M. Counts
United States Magistrate Judge